UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

MARK WAYNE SPRINKLE,

        Plaintiff,

    v.

LEON ROBINSON ,

        Defendant.

No.  2:02-cv-1563-LKK-EFB P

ORDER AND FINDINGS AND RECOMMENDATIONS

       Plaintiff is a state prisoner proceeding without counsel in an action brought under 42 U.S.C § 1983.  The court previously granted plaintiff summary judgment as to liability.  ECF No. 74.  The question of damages remains to be determined, both as to causation and the amount of damages.  Additionally, plaintiff has requested appointment of counsel.  *Id.*; ECF No. 150.  The motion for appointment of counsel will be granted.  Further, it is recommended that the court proceed as provided below as to the determination of the damages issues.

/////

/////

/////

1

1    **I.    Background**

2        Plaintiff initiated this action by filing a verified complaint on July 23, 2002.  ECF No. 1.

3    The complaint alleged that in November and December of 1999, defendants violated his First

4    Amendment right of access to the courts by denying him photocopies of documents he sought to

5    attach as exhibits to a habeas petition he filed in state superior court.  *Id.*

6        The parties filed cross-motions for summary judgment (ECF Nos. 55, 64), and on August

7    20, 2007, the undersigned recommended that defendants' motion for summary judgment be

8    denied and plaintiff's motion for summary judgment be granted as to liability.  ECF No. 71.  The

9    assigned district judge adopted that recommendation on September 26, 2007.  ECF No. 74.  In so

10   doing, the court found the following facts relevant here:

11       At all times relevant to this action, plaintiff was a state prisoner in the custody of
12       the California Department of Corrections and Rehabilitation (CDCR) at Mule
         Creek State Prison (MCSP) in Ione, California.  Defendant Robinson was a Senior
13       Librarian and defendant Pierce was a Supervisor of Academic Education and
         defendant Robinson's supervisor at MCSP.
14

15       Plaintiff was tried on multiple felony charges involving sexual offenses against
         three girls under the age of 14 with whom he was acquainted.  The case turned on
16       questions of credibility.  Plaintiff was convicted on some charges, acquitted of
         others, and sentenced to 16 years to life in prison.  Plaintiff began serving his
17       prison sentence on October 8, 1996, and was transferred to MCSP on April 15,
         1999, where he has since been continuously confined.
18

19       On November 5, 1999, plaintiff prepared to challenge his conviction by
         submitting to Cova, the B-Yard Librarian at MCSP, a state application for a writ
20       of habeas corpus with supporting documents with a request that they be copied.
         Cova submitted the documents to the Senior Librarian, defendant Robinson, who
21       took it upon himself to decide that the documents were not required under state
         rules of court and refused to copy them….  The record shows that on December
22       14, 1999, plaintiff requested three sets of photocopies of 81 pages of documents
         and two sets of copies of 437 pages of documents, for a total cost of $111.70,
23       together with a signed Trust Account Withdrawal Order.  Plaintiff had a copy
         made of the petition, without his supporting documents, and timely filed it with
24       the Mendocino County Superior Court.
25

26       At the time plaintiff filed his petition in superior court, California Rules of Court
         Rule 56 provided that "a petition that seeks review of a trial court ruling *must be*
27       accompanied by an adequate record, including copies of ... all documents and
         exhibits submitted to the trial court supporting and opposing petitioner's
28       position," "any other documents or portions of documents submitted to the trial

1

2

3

court that are necessary for a complete understanding of the case and the ruling under review," and "a reporter's transcript of the oral proceedings that resulted in the ruling under review." Rule 56, California Rules of Court (emphasis added).

4

5

6

Plaintiff had a copy made of the petition, without his supporting documents, and timely filed it with the Mendocino County Superior Court. On January 5, 2000, the Mendocino County Superior Court filed its decision denying plaintiff's petition for writ of habeas corpus, citing lack of supporting documentation as grounds for denial on as many as three issues.

7

8

9

10

11

12

13

Plaintiff sought review by submitting, on January 15, 2000, the superior court denial of his writ to the First Appellate District Court for the California Courts of Appeal. Plaintiff included correspondence to that court explaining the deficiency and lack of exhibits, and asked the court for relief and an order to direct the institution of custody to copy the exhibits referred to in the writ petition. On January 25, 2000, the court clerk for the First Appellate District Court returned plaintiff's state habeas petition, requesting plaintiff to attach the missing exhibits that defendants refused to copy, before the court would accept the petition and assign it a docket number. Court records show that plaintiff's habeas petition was denied by the First Appellate District Court on April 13, 2000.

14

15

16

17

ECF No. 71 at 4-6. The court concluded that, as a consequence of defendant Robinson's refusal to copy plaintiff's exhibits, the state superior court denied the petition in part due to lack of supporting documentation and because plaintiff "made no offer of proof by way of additional evidence." *Id*. at 11-12.

18

19

20

21

22

After a trial confirmation hearing, the district judge remanded the case back to the undersigned to set a schedule for briefing as to damages, including whether the inclusion of plaintiff's exhibits with his state habeas petition would have altered the result of that petition, and how that issue impacts plaintiff's claim for damages. ECF Nos. 119, 120. The parties have submitted their damages briefs (ECF Nos. 129, 133, 143), which are addressed below.

23

24

25

26

27

The parties agree that plaintiff's damages will be much greater if it is determined that his state habeas petition would have been granted had the exhibits been included. ECF No. 133 at 35; ECF No. 129 at 37. However, it is not clear whether that determination should be made by a jury or judge. The parties also agree that, regardless of whether the state petition would have succeeded, plaintiff is owed nominal damages, some amount of compensatory damages, and

28

1    potentially punitive damages.  ECF No. 129 at 37-44; ECF No. 133 at 29-30.  Thus, the

2    remaining issues are: (1) whether plaintiff's state habeas petition would likely have succeeded

3    with the exhibits attached; (2) whether that issue may be decided by the court rather than the jury;

4    (3) whether plaintiff sustained any compensatory damages, and the amount thereof, from the

5    deprivation of his right of access to the courts; and (4) the availability and amount of punitive

6    damages.  The undersigned concludes that the remaining substantive issues must be determined

7    either through a motion for summary judgment or jury trial.  Accordingly, these findings and

8    recommendations will provide only a summary of the remaining issues but express no opinion on

9    their resolution.

10        II.      **Plaintiff's State Habeas Petition**

11                 a.  **The Jury Must Determine the Merits of the Petition**

12        Plaintiffs who seek damages under § 1983 for alleged violations of their federal rights are

13    entitled by the Seventh Amendment to the U.S. Constitution to have their claims determined by a

14    jury.  *City of Monterey v. Del Monte Dunes*, 526 U.S. 687, 709-10 (1999).  Because plaintiff

15    seeks the legal relief of monetary damages for the violation of a constitutional right, he is entitled

16    to a jury trial, which he has requested.  *See id.*; ECF No. 30 at 1.

17        Defendants ask that the court, rather than the jury, determine one major issue impacting

18    the amount of plaintiff's damages—whether plaintiff's state habeas petition would have been

19    successful if the exhibits had been attached.  Defendants cite *Smith v. Superior Court of San Luis*

20    *Obispo County*, 234 Cal. App. 2d 1, 5 (1965), in which the court noted that there is no right to

21    have a jury determine the merits of California state habeas petitions.  While it is true that plaintiff

22    had no right to have a jury determine the merits of his underlying habeas petition when it was

23    filed in state court, and certainly no right to have a jury grant habeas relief, this does not mean

24    that he has no right to have a jury consider the relative strength or weakness of that petition in

25    order to determine the amount of compensatory damages, if any, plaintiff is owed in this § 1983

26    action.  Defendants have cited no authority for so holding.

27        In arguing for a bench trial on this question, defendants characterize this § 1983 damages

28    claim as presenting entirely legal, rather than factual, issues.  Defendants are mistaken.  There are

4

1    plainly several factual issues which must be addressed in deciding damages, and the underlying

2    causation question is merely one.  Moreover, defendants' focus is misplaced.  There is no right to

3    jury trial in California state habeas actions not because they raise solely legal issues, but rather

4    because such actions have traditionally been heard by the court without a jury and their governing

5    statutes (in California as well as in federal court) do not provide for trial by jury.  *In re*

6    *Hawthorne*, 35 Cal.4th 40, 50 (2005) (noting that the state habeas statutes, particularly California

7    Penal Code § 1484, provide for a judge or court to hear a habeas claim); *Sigler v. Parker*, 396

8    U.S. 482, 487 & fn. (1970) (Douglas, J., dissenting) (noting that the tradition that no jury sits in

9    habeas actions has been codified in the federal habeas statutes at 28 U.S.C. § 2243).  This

10   tradition appears grounded in the historical division between judge and jury of legal and equitable

11   remedies and the principle that the Seventh Amendment to the Constitution preserves the right to

12   trial by jury in a civil matter only to the extent that it existed at common law or by statute prior to

13   the adoption of the Constitution.  U.S. Const., amend. VII; *see Barry v. White,* 64 F.2d 707

14   (1933).  The grant of habeas relief involves the exercise of equitable remedies in the form of an

15   order to compel the release of a petitioner, a remedy beyond the traditional purview of a jury.

16          Here, the question is one of monetary damages, not whether to order the plaintiff's

17   release.  The trier of fact must determine whether plaintiff can show by a preponderance of the

18   evidence that he was actually injured (i.e., sustained damages) by the interference with his right

19   of access to the courts when he was prevented from filing the papers required to support his

20   petition.  In so deciding, the trier of fact can consider whether the habeas claim appears to have

21   been so weak that it would not likely have been granted even if his supporting exhibits had been

22   timely filed.  Likewise, it can consider whether that claim appears to have been strong enough

23   that it likely would have been granted, and if so, award compensatory damages for the

24   deprivation.  Neither of these considerations requires the trier of fact to actually grant or deny

25   habeas relief.  Any consideration of the merits of the underlying state habeas petition is merely

26   incidental to the determination of damages.  In the analogous situation of a legal malpractice trial-

27   within-a-trial, courts have found plaintiffs entitled to a jury on the question of damages, including

28   whether the underlying trial would have succeeded, regardless of whether that underlying case

would have been tried to a jury or other factfinder. *Salisbury v. County of Orange*, 131 Cal. App. 4th 756, 764 (2005) ("Even where the underlying action is equitable, the right to jury trial in the legal malpractice case prevails."); *Piscitelli v. Friedenburg*, 87 Cal. App. 4th 953, 970 (2001) (same).

Thus, whether plaintiff has suffered damages from the deprivation of a federally protected right appears to be factual question appropriate for the jury to consider and decide. Not unlike claims involving both equitable and damages remedies, in which the court decides issues material to the grant of injunctive or other equitable relief and a jury decides the damages issues, there is no reason why the jury cannot resolve the damages questions here.[1]

In the damages brief, defendants are in essence arguing that there is no triable issue of material fact that plaintiff's state habeas petition would have failed. If defendants wish to expressly make that argument, they should seek to modify the scheduling order and file a motion for summary judgment of the issues they believe are appropriate for such disposition, providing the appropriate notice to plaintiff under *Woods v. Carey*, 684 F.3d 934 (9th Cir. 2012) and *Rand v. Rowland*, 154 F.3d 952, 957 (9th Cir. 1998).

### b.  The Substance of the Petition

#### i.  <u>The Petition and the Superior Court's Denial</u>

Plaintiff's habeas petition raised six enumerated grounds for relief. ECF No. 153-2 at 7. In ground one, he actually articulated two distinct claims. First, he claimed that he was actually innocent of the charges, as shown by the fact that his victims "all recanted parts of their testimony and statements at various times during interviews and hearings." *Id.* at 28. Second, plaintiff claimed that his federal constitutional rights to a fair and impartial jury were violated by the misconduct of the foreperson. *Id.* at 33. The superior court denied relief on ground one because

/////

---

[1] While in some mixed damages and equitable relief cases a court might consider a jury's verdict advisory, it is not a legal impossibility for the judge and jury to reach seemingly contrary results, with damages being awarded and injunctive relief denied. Moreover, even in a habeas petition courts historically have had the discretion to use an advisory jury. *Sigler v. Parker*, 396 U.S. at 487 & fn. The point is, the role of the jury here is limited to factual findings as to damages and not to whether an order should issue to release plaintiff from confinement.

> The victims' varying accounts of what happened was tried by a jury who made findings of fact, applied those findings to the law, and found petitioner guilty. Petitioner has made no offer of proof by way of additional evidence that the findings are unreasonable. He merely disagrees that their findings were beyond a reasonable doubt.

ECF No. 59-4 at 13.

In ground two, plaintiff argued that the trial court violated his federal constitutional rights by denying access to some confidential records associated with the victims. ECF No. 59-3 at 3. The superior court denied relief on ground two because

> An in camera hearing was conducted by the trial judge to determine whether any of the materials sought by the defense had any exculpatory content. He ruled that they did not. Petitioner has failed to offer any proof that this finding was flawed or otherwise incorrect.

ECF No. 59-4 at 13.

In ground three, plaintiff argued his federal constitutional rights were violated due to bias by the trial judge. ECF No. 59-3 at 11. The superior court denied relief on ground three because, "Petitioner makes reference to a sworn affidavit of George Hoffman which is not included as part of his petition, nor can it be found in the court file." ECF No. 59-4 at 13.

In ground four, plaintiff argued that his federal constitutional right to a jury chosen from a representative cross-section of the community had been violated. ECF No. 59-3 at 15. The superior court denied relief on this ground because

> This was an issue raised and addressed in petitioner's appeal. This court has reviewed the appellate decision and concludes that the jury selection process in Mendocino County at the time of petitioner's trial conformed to law.

ECF No. 59-4 at 13.

In ground five, plaintiff argued that his trial counsel had rendered ineffective assistance by failing to properly investigate the veracity of a tape played at trial. ECF No. 153-2 at 65. Plaintiff listed many further alleged deficiencies of counsel, but did not provide any supporting explanation or argument. Specifically, plaintiff claimed that counsel should have: (1) asked "relevant questions [plaintiff] posed to him that could have strong bearing on the truth seeking process"; (2) communicated more with plaintiff; (3) considered strategy suggested by plaintiff; (4) called 33 unidentified defense witnesses; (5) presented school and CPS records pertaining to

7

1    two of the victims; (6) subpoenaed "relevant police reports and transcripts of hearings pertinent to

2    this case"; (7) had an investigator interview the victims and witnesses; (8) filed a demurrer

3    regarding a crime "charged to have occurred [sic] in Colusa County"; (9) presented "a relevant

4    defense" at the preliminary hearing; (10) hired several expert witnesses "to prove critical issues

5    favorable to [the] defense"; (11) filed motions to dismiss for prosecutorial misconduct, "to have

6    Attorney General prosecute case," for change of venue, to disqualify the judge, to view the crime

7    scene, and "for vindictive prosecution;" and (12) impeached key witnesses, including

8    McCormick, Fullmer, and Officer Rick Wagner. *Id.* at 65-67.  In denying relief on ground five,

9    the superior court stated,

10         Petitioner refers to exhibit D-1, which is not included with his petition and cannot
           be found in the court file.  The only affidavit touching on attorney incompetence
11         was one submitted by attorney David Nelson in support of a motion for a new
           trial, wherein he admitted that he failed to ask for a polling of the jury as to
12         specific counts.  This does not constitute ineffective assistance of counsel, and
           none of petitioner's other allegations justify the granting of a hearing as
13         requested.

14   ECF No. 59-4 at 14.

15         In ground six, plaintiff argued that the introduction of a tape recording at trial violated his

16   federal constitutional and state statutory rights.  ECF No. 153-2 at 75.  In denying relief on this

17   ground, the superior court stated, "This issue was addressed in petitioner's appeal.  The court has

18   reviewed the appellate decision and finds no basis conclude [sic] that it is not legally sound."

19   ECF No. 59-4 at 14.

20         Relevant here, the superior court denied relief on grounds three and five with specific

21   reference to a missing exhibit.  The court additionally cited plaintiff's failure to offer proof in

22   denying relief on grounds one and two.  Thus, the focus here must be on whether the specifically

23   cited exhibits or other documents plaintiff had asked defendants to copy would have changed the

24   state court's decision on grounds one, two, three, or five.  As the superior court did not rely on a

25   failure of proof in denying relief on grounds four or six, the jury need not revisit those issues here

26   (that is, there is no indication that any additional documentation would have altered the outcome

27   on those particular grounds).

28   /////

ii.  **Summary of Ground One**

a.  **Victims' Inconsistent Statements**

In his petition to the superior court, plaintiff argued that his conviction should be reversed because the inconsistent statements of the victims showed that he was innocent.  ECF No. 153-2 at 28-33.  Plaintiff argued that the victims had been coerced to fabricate their trial testimony.  *Id.*

Defendants argue that the state court would have denied plaintiff's petition on this issue because it either was or could have been raised in plaintiff's direct appeal of his conviction.  This argument is based on a state procedural rule summarized by the California Supreme Court in *In re Harris*, 5 Cal.4th 813 (1993).  Under that rule, issues that could have been raised on appeal, as well as issues that actually were raised on appeal, cannot be argued in a state habeas petition.  *Id.* at 829.  This rule exempts issues that raise a fundamental constitutional defect, *id.* at 829-34, and claims that the trial court lacked personal or subject matter jurisdiction, *id.* at 836.  As the court explained in *Harris*, constitutional defects that may be heard on habeas are those that are "both clear and fundamental, and strike[] at the heart of the trial process" as well as claims of ineffective assistance of counsel.  *Id.* at 831-34.  "Fundamental" constitutional defects are those that "so fatally infected the regularity of the trial and conviction as to violate the fundamental aspects of fairness and result in a miscarriage of justice."  *Id.* at 831.

Plaintiff contends that the issue of inconsistent victim statements does allege a fundamental constitutional defect.  Plaintiff also argues that, because the superior court did not cite the *Harris* rule in denying relief, but rather considered the merits of ground one, this court should not rely on the rule in determining whether the state court would have granted relief on ground one if the supporting exhibits had been attached.  Rather, petitioner argues, this court should consider the merits as the state court did.

b.  **Jury Misconduct**

Plaintiff argued in his superior court habeas petition that the jury foreperson committed misconduct by illegally terminating deliberations by sending verdicts in to the court without consulting the other jurors.  ECF No. 153-2 at 33-41.  Plaintiff also argued that the trial court erroneously entered the verdicts before answering a question the jury had asked.  *Id.*  Plaintiff

1    tried to support these arguments with declarations from Jurors Thornton and Phillips, but

2    defendants refused to copy them.  The superior court's denial of the petition is silent as to this

3    claim for relief, so it is unclear whether plaintiff's inability to append the juror declarations

4    impacted the decision.

5          Plaintiff raised the issue of jury misconduct in the direct appeal of his conviction.  ECF

6    No. 133-8 at 45-57.  The appellate court provided the following useful background:

> The jury began deliberating on Wednesday, August 28, 1996.  On Friday, August 30, the court announced that the jury had notified the bailiff it had reached verdicts on some of the counts.  The jurors entered the courtroom and the court asked whether they had reached verdicts on some of the counts.  The foreman responded that they had.  The foreman delivered those verdicts to the bailiff.  The court noted the forms appeared to be in order as to counts one, two, three, four, nine, and eleven, and began reading the verdicts.
>
> The court first read the verdict on count one as guilty and asked the jury as a group whether that was their verdict.  The jurors jointly responded it was.  At the request of defense counsel, the court individually polled each juror and received the same response.  It then directed the clerk to record the verdict.
>
> The verdict on count two was read as guilty.  The court again asked for, and received, a group affirmation that this was the jury's verdict.  Defense counsel waived individual polling and the court directed the clerk to record the verdict.  The court then received verdicts on counts three, four, nine, eleven and five, each time obtaining a group affirmation and asking the parties if they wanted to poll the jurors before recording the verdicts.  Each time, the answer was no.
>
> After the court took the verdict on count five, one of the jurors said: "I think there's a couple of us that feel a little not sure on count two.  And if there was a split verdict on that, would it make a decision on the – would it matter on the whole – as a decision as a whole?"  The court responded, "In answer to your question, the jury has reached a verdict on count two, and the verdict has been accepted and recorded."  Defense counsel asked to have the jury polled as to count two.  The court denied the request, noting counsel had waived polling and the verdict had been recorded.  The court then took the remaining verdicts.  The two counts and special enhancement allegations on which the jury had not reached a verdict were subsequently dismissed.
>
> Defendant moved for a new trial, alleging, inter alia, juror misconduct and failure to properly advise the jury before entering the verdicts.  The motion was supported by affidavits from jurors Donna P. and Valerie T.  Valerie T. declared that, although she voted to convict on counts 1 through 3 on Thursday, August 29, she had misgivings about counts 2 and 3 later that night.  On Friday morning she discussed her change of heart with Donna P., who also wanted to reconsider her vote of the previous day.  At the time the jury was still deliberating on a child stealing count and wondering whether they could submit verdicts on some counts and not others without necessitating a whole new trial.  The jury sent the judge a question about the child stealing charge and asked about the effect of returning verdicts on only some counts.  Again, according to Valerie T.: "The next thing we knew, the bailiff was asking if we had the verdicts on some counts and when he

10

was told that we did we were brought back into court." Without answering their written questions, the judge read the verdicts they had reached. Valerie T. was surprised because the jury had not had a chance that morning to reconsider them. When individually polled, she affirmed that she had voted to convict on count one. She kept silent, however, when the jury was polled on counts two and three. She later attempted to raise her reservations about count two, but the judge replied the verdict had already been recorded.

Juror Donna P.'s declaration stated she was the last holdout for not guilty on count two, and that she had only voted guilty under pressure from other jurors who told her it would be a hung jury unless they agreed on every count. She finally agreed to vote for guilt, but told the other jurors she "would go to [her] grave believing that [defendant] was not guilty of that count." Valerie T.'s declaration confirmed Donna P.'s initial reluctance to vote guilty on count two and her statement of disbelief in defendant's guilt.

Donna P. attested that Valerie T. had expressed misgivings to her on Friday morning. Donna P. was surprised and did not know what to do when the judge began reading the verdicts in court instead of answering the jury's questions. She affirmed her verdict on count one when polled individually, but thinks she did not reply when the court asked the jury as a group about count two. Her declaration states she is sure the jury would have reconsidered count two and "possibly" count three had the judge told them they could return verdicts on fewer than all counts.

The note the jury sent to the court reads: "If verdicts are found on all but one court [*sic*] and the jury cannot reach a decision on this one count, what happens? also: see enclosed." The note is signed by the foreman. Below the question, in what appears to be a different handwriting, is a notation reading: "The jury states they have reached verdicts on most of the counts. Also, foreperson says they should finish today." The notation is unsigned.

The court granted the new trial motion as to count two only, on the ground that one of the jurors who had voted to convict on that count in fact believed defendant was not guilty. In all other respects, it denied the motion . . . . Count 2 was subsequently dismissed.

*Id.* at 52-54. In denying relief, the appellate court stated:

The question here is whether the court prejudicially erred in failing to answer the jury's question about the effect of failing to reach unanimous verdicts on all counts. [footnote omitted]

As noted above, at some point after sending its note to the court on Friday morning the jury informed the bailiff it had reached verdicts on some of the counts. In this situation, it was not improper for the court to take the verdicts that the jurors *had* been able to reach before responding to their questions. (*People v. Finney* (1980) 110 Cal.App.3d 705, 714-715; *People v. Rigney* (1961) 55 Cal.2d 236, 246-247.) While it might generally be better practice for a court to confirm that the jury's questions pertain only to the undecided counts before taking the verdicts on counts the jury has decided, there is no legal requirement that it do so. Here, the court had no reason to believe its response would affect the verdicts already reached nor should it have anticipated that jurors may have been considering conviction simply to avoid retrial when they had been instructed to decide the case based on the facts and the law. (CALJIC No. 1.00 (6th ed. 1996).)

11

After the court had taken the verdicts and the remaining counts had been dismissed, the jury's questions about the remaining child stealing charge and the effect of a verdict on fewer than all counts became a moot point. [footnote: We note that, even were the procedure improper, defendant has not established prejudice. (*People v. Watson* (1956) 46 Cal.2d 818, 836; *People v. Kageler* (1973) 32 Cal.App.3d 738, 746.) Defendant argues the procedure had the effect of prematurely terminating deliberations while two jurors were reconsidering their verdicts on counts two and three. Assuming arguendo that the jury might have reached a different verdict on count two had they deliberated further, that count was dismissed after trial. As to count three, the court implicitly, and reasonably, rejected defendant's vaguer showing that jurors Valerie T. and Donna P. had misgivings about that count and "possibly" would have reconsidered it had they known a unanimous verdict on every count was not required.]

In a related argument, defendant contends reversal is compelled by the jury foreman's misconduct in (1) failing to communicate the jury's questions to the court, and (2) unilaterally telling the bailiff that the jury had reached verdicts without consulting the jury . . . . [T]he record does not bear him out. As a factual matter, the record does not indicate that the jury questions (which are part of the clerk's transcript) failed to reach the court or, even had that been the case, that the foreman was at fault. As to the second point, six jurors submitted declarations stating they knew the verdict forms were signed and completed as to counts one through three, and even juror Valerie T. attested that she knew the bailiff was told the jury had reached verdicts on some counts.

The process here was fair. The jury informed the bailiff it had reached verdicts on some counts. The verdicts were read in open court and the jury was generally polled. If the jurors continued to be troubled by unanswered questions or wished to reconsider the verdicts they had already voted on, they had the opportunity to voice those reservations at that time. With the exception of count two, which was dismissed after trial, they did not do so. We find no basis for reversal.

*Id.* at 55-56. In his superior court petition, plaintiff argued that the appellate court got it wrong because the juror declarations show that Thornton and Phillips were resolved to voting not guilty on count three when court resumed on August 30th. ECF No. 153-2 at 40. The declarations indicate that, as of the morning of August 30th, Thornton and Phillips did not wish to vote guilty on counts two[2] and three. Juror Thornton declared that she had reconsidered her vote on the night of August 29th and that, "If I had been individually polled as to my verdict as to Count Two and Count Three I would have said, 'No [that is not my verdict].'" ECF No. 133-5 at 57-59. Juror Phillips declared that, had the verdicts not been entered, the jury "possibly" would have reconsidered count three and that she does not believe "that a crime was committed . . . as

---

[2] Any issues plaintiff may have with the jury's treatment of count 2 were rendered moot when the trial court granted a motion for new trial as to that count. ECF No. 133-8 at 14.

1    described by [victim] Kristy in Count Three." *Id.* at 61-62.

2           Defendants argue for the application of the *Harris* rule to this claim and further assert that

3    the superior court would have denied relief on the claim even with the juror declarations, because

4    the record shows no jury misconduct and, if there was any irregularity, it was made harmless

5    when the trial court dismissed count two.

6                          iii.   **Summary of Ground Two**

7           In ground two of his superior court habeas, plaintiff argued that the prosecutor illegally

8    withheld certain confidential records regarding the alleged victims and that the trial court erred by

9    not ordering the records entirely disclosed to the defense.  ECF No. 153-2 at 45-52.  The state

10   court denied the claim, citing, in part, plaintiff's failure to provide supporting proof.  Defendants

11   argue that the state court would have denied this claim under the *Harris* rule, discussed above,

12   because it could have been raised on plaintiff's direct appeal.  Defendants also argue that the

13   claim would have been denied because it is substantively meritless, as the trial court complied

14   with the relevant Supreme Court precedent in conducting an *in camera* review of the records and

15   disclosing those that were relevant.  *See Pa. v. Ritchie*, 480 U.S. 39, 58-60 (1987) (holding that a

16   defendant accused of child abuse has the constitutional right to have the trial court review

17   confidential records pertaining to the alleged victim to determine whether they contain

18   information that may affect the trial's outcome, but does not have the right to review the files

19   himself).

20                          iv.   **Summary of Ground Three**

21          In ground three, plaintiff argued to the superior court that he had been denied a fair trial

22   because the trial judge was a personal friend of the mother of one of the victims.  The court

23   denied the claim because plaintiff had not attached the supporting declaration of George

24   Hoffman, due to defendants' refusal to copy it.  In that declaration , Hoffman attests that he was

25   formerly married to Christine Fullmer, mother of victim Natasha Bailey.  ECF No. 133-2 at 62-

26   63.  Hoffman declares that the trial judge, Judge Luther, was a "long-time friend and employer"

27   of Fullmer and her mother Maryanne Gump, who were "domestic workers at his personal

28   residence."  *Id.*  Hoffman claims that Fullmer and her mother "used their influence with Judge

1   Luther to gain my release from jail." *Id.*

2   Defendants concede for the purposes of their damages brief that, if Judge Luther had the

3   relationship with Fullmer and Gump described by Hoffman, that relationship mandated his

4   disqualification as trial judge. However, defendants argue that inclusion of the Hoffman

5   declaration would not have caused the superior court to grant plaintiff relief on ground three,

6   "because Judge Luther did not have the relationship described in Hoffman's declaration." ECF

7   No. 133 at 28. Defendants have produced a declaration from Judge Luther in which he attests

8   that he does not know Fullmer or Gump and did not employ them. ECF No. 133-8 at 79-81.

9   Judge Luther does not recall whether he ever ordered Hoffman released from custody, but if he

10  did, he did so "based on information presented in court and not as a personal favor to Maryann

11  Gump or anyone else." *Id.*

12  Plaintiff responds that, had defendants copied the Hoffman declaration, the state court

13  would have held an evidentiary hearing and appointed counsel for plaintiff, which would have

14  allowed him to further investigate and present testimony from Fullmer, Gump, and "other people"

15  showing that Judge Luther knew Fullmer and Gump. Plaintiff states that Gump has since died

16  and that he does not have the resources to obtain supporting declarations from Fullmer or others

17  because he is incarcerated.

18  Defendants contend that the Hoffman declaration is hearsay, but concede that the superior

19  court may have ordered an evidentiary hearing to determine the issue had they been provided with

20  the declaration. Defendants argue that, once the state court heard testimony from Judge Luther

21  that he did not know and never employed Fullmer or Gump, the claim would have been denied.

22  **v.   Summary of Ground Five**

23  In ground five, plaintiff argued that his trial counsel had rendered ineffective assistance

24  primarily by failing to properly investigate a tape played at trial, in which plaintiff made

25  incriminating statements to his ex-girlfriend (the mother of one of the victims).[3] ECF No. 153-2

26  _____

27  [3] Although plaintiff's state petition also included a laundry list of other perceived
    deficiencies of his trial lawyer, plaintiff did not provide any argument, authority, or citations to
    supporting exhibits on any issue other than the taped call. ECF No. 153-2 at 66-67. Plaintiff has
28  provided only one exhibit to this court supporting another ineffective assistance claim, an

at 66-73.  Plaintiff argued that defense counsel admitted in a letter that he failed to properly

investigate the tape.  *Id.* at 65.  Plaintiff wished to append to his superior court habeas the results

of tests performed by Stutchman Audio Laboratory on the tape and the letter from his trial

counsel.

    The letter from trial counsel David Nelson to plaintiff's post-trial counsel provides useful

background on ground five:

> This letter is in response to your letter of March 3, 1998, regarding my handling
> of the Christine Fullmer tape in the Mark Sprinkle trial.  I will try to address your
> questions as best I am able.
>
> It is true that the tape was a critical piece of evidence and we were aware of that
> from the start.  As you may know, other attorneys represented Mr. Sprinkle before
> I was appointed to the case and I inherited the discovery from them.  Mark had
> explanations for what he said on the tape and our primary efforts were to keep the
> tape out of evidence at the trial based on privacy and wiretap issues, as set forth in
> our In Limine Motion.
>
> Mark did raise questions about the tape being tampered with, but he did not say he
> never had such a conversation.  Indeed, he explained each of his admissions and
> his emotions on the tape (and did so also in his trial testimony).  He could not
> point to a part of the tape where he thought there was a break or something had
> been inserted.  A review of the tape and the transcript of the tape led me to believe
> that it was one conversation as it flowed logically and there was no apparent break
> in the conversation.  It is clearly Mark's voice.
>
> As trial approached I felt it was necessary to clear up any questions, so I did
> contact Charles Salter & Associates to have them analyze the tape for any
> tampering (there was also a second tape of phone calls to Christine's sister Glenda
> which was analyzed).  I probably should have sent the tape sooner, but I contacted
> Jack Freytag of Salter & Associates (Audio Forensic Center) on August 8, 1996,
> and they said they could do the work immediately.  I explained our concerns with
> the tape and that we wanted them to be analyzed for any alterations or possible
> tampering.  I obtained a court order for the expert assistance and delivered the
> tapes to them on August 9, 1996.  They were aware that trial was about to begin.
>
> I chose Charles Salter & Associates because I had heard they were skilled at
> analyzing tapes for forensic issues.  I had been involved in a previous case where
> Mike Stepanian's office had used them in analyzing a tape involving a co-
> defendant, and Mr. Stepanian had recommended him.
>
> On August 12, 1996, which was the first day of jury selection scheduled in the
> trial, Niko Wenner called my office after analyzing the tapes.  He reported to my
> secretary that he found nothing odd or anything that appeared to be an alteration

affidavit from his trial attorney stating that he had no good reason not to poll the jurors.  ECF No.
144 at 47-49.  The superior court specifically stated that they had reviewed that affidavit in
denying the petition ECF No. 153-2 at 3, so defendants' constitutional violation did not prevent
the superior court from seeing that exhibit.

on the tape of the call to Christine.  He said they did both an audio and a computer analysis.

I called him back that day after trial and discussed the results with him personally. He explained how they listen to background sounds, etc., and the technology of their computer analysis.  He said there were breaks on the second tape of the call to Christine's sister Glenda, but these were obvious times when Mark would say "Hold on a minute" while he went to get medications or whatever.  He said he could provide a written report, but I declined since there was nothing helpful in his oral report.

After talking to Mark about the results, we were still concerned about the "beeps" on the tape, so I called Mr. Wenner again on August 13, 1996, and he said he would do an analysis of the frequency of the beeps and send it back to me.  He did so and sent me the one page document dated August 14, 1996, which I supplied to you.

I did not feel that the information gained from the analysis of the tape provided me with a basis to attack the substance of the tape as being doctored.  I did not see that any further investigation of the tape would be fruitful.  Jury selection was completed on August 19, 1996, and the trial began.

ECF No. 133-4 at 20-21.

Plaintiff argued in the superior court petition that Nelson's failure to have the tape analyzed until the eve of trial was deficient.  ECF No. 153-2 at 69-72.  He vaguely argued that an audio forensic expert needed "sufficient time" to analyze the tape and that Mr. Wenner's analysis was too cursory because of the short amount of time he was given to look at the tape.  *Id.* at 70.

In a declaration with an attached report, Gregg Stutchman, owner of Stutchman Audio Laboratory, attests that he was hired by plaintiff's post-trial counsel to analyze the tape of the phone call between plaintiff and Ms. Fullmer.  ECF No. 144 at 4-6.  Mr. Stutchman declares, "Based on my analysis it is my opinion that the Exhibit 6, the tape received into evidence [of plaintiff's conversation with Ms. Fullmer] is not an original recording, but one that an original tape or tapes were selectively copied onto, to include or exclude content desired by the person doing the copying."  *Id.* at 5.  Mr. Stutchman also concluded that beeps on the recording did not originate at the jail in which plaintiff was incarcerated when the recording was made.  *Id.* Plaintiff's superior court petition implied that, with enough time, Mr. Wenner would have reached the same conclusion and the tape would have been excluded from the trial.  ECF No. 153-2 at 70-71.

/////

16

1   Defendants argue that the Nelson letter shows that trial counsel appropriately had the tape

2   analyzed and thus would not have changed the outcome of the superior court petition.

3   Defendants do not address the Stutchman declaration.

4   **III.   Other Bases for Compensatory Damages**

5   Even if the jury concludes that plaintiff could not have prevailed in his state habeas by

6   filing the documents that defendants unlawfully refused to copy, "the opportunity to press even

7   unsuccessful suits has a value in itself[.]"  *Phillips v. Hust*, 477 F.3d 1070, 1081 (9th Cir. 2007),

8   *vacated on other grounds*, 555 U.S. 1150 (2009).  That value may be measured, at least in part,

9   by a plaintiff's costs expended in pursuing the litigation with which the defendant wrongfully

10  interfered.  *Id.*  Plaintiff, who was incarcerated, estimates his costs at "no more than $100.00."

11  ECF No. 129 at 39.  Such a request does not appear to cross the line between the compensation

12  for "value" permitted by *Phillips* and attorney's fees, which are not permitted.[4]  Defendants have

13  not addressed whether the law supports an award of damages to plaintiff for time spent preparing

14  the superior court habeas petition.  However, *Phillips, supra,* had this to say in determining that

15  "costs" of litigating the underlying suit are recoverable:

16
17
18
19
20
21
22
> Phillips requested not the economic value of the remedy he sought
> in the underlying suit, but his costs in prosecuting that suit over the
> course of many years, and the district court appears to have based
> its damages award, at least in part, on that request.  Hust argues
> that, because Phillips could not have recovered his costs had he
> prevailed in the Supreme Court, he cannot as a matter of law
> recover them here. This contention misapprehends the nature of the
> injury Phillips asserts. Phillips is not claiming that Hust's actions
> deprived him of the opportunity to recover his costs; rather, his
> claim is that he was robbed of his day in court, of the opportunity to
> be heard, whether he prevailed or not. Neither party has pointed to
> any authority addressing the availability of the remedy Phillips
> seeks, and we have discovered none.

23  477 F.3d at 1081. The court then suggests as least one measure of damage for Sprinkle's lost

24  opportunity here. After acknowledging that "the opportunity to press even unsuccessful suits has

25
26
27
28
    [4] Plaintiff notes that he spent hundreds of hours preparing his state petition and litigating
this case and suggests that he receive compensatory damages for this time spent.  While plaintiff
is free to argue to the jury that it should award some amount of general damages, he may not
recover damages specifically allocated for time spent litigating the case, as such an award would
essentially grant attorney fees to a *pro se* litigant. *Kay v. Ehrler*, 499 U.S. 432, 435 (1991) ("[A]
*pro se* litigant who is not a lawyer is not entitled to attorney's fees.").

1   a value in itself, and is constitutionally protected," *id.,* the court concluded that awarding the costs

2   of the underlying suit recognizes that the plaintiff incurred those costs "in the expectation that he

3   would be able to exercise those rights and press his legal contentions to the full extent permitted

4   by the law, and even if he was ultimately unsuccessful." *Id.* The same can be said as to

5   Sprinkle's costs incurred in his underlying action.

6       Plaintiff also intends to argue that he should be granted damages for emotional distress

7   regardless of whether the court concludes that his state petition would have been successful.

8   Defendants argue that plaintiff could not have suffered much emotional distress because he knew

9   that most of the issues he raised in the superior court habeas had been rejected by other state

10  courts (and thus presumably could not have been holding out much hope that the result would

11  have been different in the superior court).  The parties can present their respective arguments to

12  the jury, but it is for the jury to decide whether to award any such damages after it has heard the

13  evidence.

14      **IV.    Punitive Damages**

15      To obtain punitive damages, plaintiff must establish that defendants' conduct was driven

16  by evil motive or intent or involved a reckless or callous indifference to the constitutional rights

17  of others." *Dang v. Cross*, 422 F.3d 800, 807 (9th Cir. 2005).  Plaintiff argues that defendants

18  acted maliciously in denying his request for copies.  Defendants claim that the jury will likely

19  award little or no punitive damages because they will likely consider defendants' misconduct to

20  be "at most, a mistake arising from their good-faith attempt to apply prison procedures and

21  regulations, and complex court rules, to Sprinkle's request for copies."  ECF No. 133 at 35-36.

22  The question is appropriate for the jury to resolve.

23      **V.    Motion for Appointment of Counsel**

24      Plaintiff requests appointment of counsel.  District courts lack authority to require counsel

25  to represent indigent prisoners in section 1983 cases.  *Mallard v. United States Dist. Court*, 490

26  U.S. 296, 298 (1989).  In exceptional circumstances, the court may request an attorney to

27  voluntarily to represent such a plaintiff.  *See* 28 U.S.C. § 1915(e)(1); *Terrell v. Brewer*, 935 F.2d

28  1015, 1017 (9th Cir. 1991); *Wood v. Housewright*, 900 F.2d 1332, 1335-36 (9th Cir. 1990). When

1   determining whether "exceptional circumstances" exist, the court must consider the likelihood of

2   success on the merits as well as the ability of the plaintiff to articulate his claims pro se in light of

3   the complexity of the legal issues involved.  *Palmer v. Valdez*, 560 F.3d 965, 970 (9th Cir. 2009).

4   Having considered those factors, the undersigned concludes that the calculation of damages in

5   this action presents unusually complex issues and that counsel should be provided.  Accordingly,

6   the court will grant plaintiff's motion and refer this case to Sujean Park, the court's ADR & Pro

7   Bono Coordinator to attempt to locate pro bono counsel to represent plaintiff in these

8   proceedings, as directed below.

9       **VI.    Order and Recommendation**

10       It is hereby ORDERED that:

11       1.  Plaintiff's motion for appointment of counsel (ECF No. 150) is granted.  This case is

12   referred to Sujean Park, the court's ADR & Pro Bono Coordinator to attempt to locate pro bono

13   counsel to represent plaintiff in these proceedings.

14       2.  If an attorney can be found to represent plaintiff, that attorney shall be appointed as

15   counsel for plaintiff in this matter until further order of the Court.

16       3.  All proceedings in this action are STAYED until four (4) weeks from the date an

17   attorney is appointed to represent plaintiff in this action or until the Court otherwise lifts the stay.

18       It is further RECOMMENDED that the court conduct a jury trial to determine the amount

19   of damages due to plaintiff.

20       These findings and recommendations are submitted to the United States District Judge

21   assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

22   after being served with these findings and recommendations, any party may file written

23   objections with the court and serve a copy on all parties.  Such a document should be captioned

24   "Objections to Magistrate Judge's Findings and Recommendations."  Failure to file objections

25   /////

26   /////

27   /////

28   /////

within the specified time may waive the right to appeal the District Court's order. *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

DATED:  August 6, 2014.

EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE